UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| DELAWARE DEPARTMENT OF NATURAL RESOURCES AND ENVIRONMENTAL CONTROL<br><br>    Petitioner,<br><br>    v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br><br>    Respondent.<br><br>ELECTRIC POWER SUPPLY ASSOCIATION, ET AL.,<br><br>    Intervenors. | No. 13-1093 |

Consolidated with 13-1102 & 13-1104

**RESPONSE TO RESPONDENT'S MOTION FOR STAY OF MANDATE OF THE AMERICAN PUBLIC POWER ASSOCIATION**

Respondent United States Environmental Protection Agency (EPA) has moved for a stay of the issuance of the mandate in this matter until May 1, 2016. Intervenor American Public Power Association (APPA) supports delaying the issuance of the mandate. Indeed, the circumstances recited in EPA's motion justify leaving its current regulations in place until the agency has issued interim (or permanent) standards on remand. The arbitrary deadline is unwarranted.

1. APPA is the national service organization representing the interests of not-for-profit, state, municipal, and other locally owned electric utilities throughout the United States. More than 2,000 public power utilities, located in every state but Hawaii, collectively serve over 48 million customers and provide over 15 percent of the kilowatt-hour sales of electricity to ultimate consumers in the Nation. The primary goal of APPA utility members is providing customers in their communities with reliable electric power and energy at the lowest reasonable cost, consistent with good environmental stewardship.

APPA and a number of its utility members participated in the underlying rulemaking. Indeed, EPA's motion attaches (as Exhibits 1 and 2) excerpts from the rulemaking comments of APPA and of one of its members, the Kansas Power Pool. The terms of judicial relief in this case are vitally important to APPA and its member utilities.[1]

2. The regulations challenged in this case provide that emergency stationary reciprocating internal combustion engines (hereinafter, "emergency engines") may operate for up to 100 hours per calendar year for any combination of three purposes: (i) "for maintenance checks and readiness testing"; (ii) "for emergency demand response for periods in which the Reliability Coordinator … has declared an Energy Emergency Alert Level 2" under the mandatory reliability standards for

---

[1] The Kansas Power Pool has filed a response supporting EPA's motion.

2

the Nation's bulk electric system; or (iii) "for periods where there is a deviation of voltage or frequency of 5 percent or greater below standard voltage or frequency." *See* 40 C.F.R. § 63.6640(f) (2)(i)–(iii); 40 C.F.R. § 4211(f)(2)(i)–(iii); 40 C.F.R. § 4243(d)(2)(i)–(iii). In its amended opinion of July 21, 2015, the Court reverses, as arbitrary and capricious, the regulations allowing emergency engines to operate for the second and third purposes, and remands them to EPA for further action. *See* Slip Op. at 30 (*citing* 40 C.F.R. § 63.6640(f) (2)(ii)–(iii); 40 C.F.R. § 4211(f)(2)(ii)–(iii); 40 C.F.R. § 4243(d)(2)(ii)–(iii)).

The Court states that if vacating the challenged portions of the regulations "will cause administrative or other difficulties, 'EPA (or any of the parties to this proceeding) may file a motion to delay issuance of the mandate to request either that the current standards remain in place or that EPA be allowed reasonable time to develop interim standards.'" *Id.* at 30 (citations omitted).[2]

3. EPA's interpretation is that if these regulations are vacated, emergency engines may not operate for either of these two purposes for any period of time,

---

[2] In *Conservation Law Foundation v. EPA*, Nos. 13-1233 & 14-1199, petitioners challenge the portion of the 2013 Rule providing that emergency engines may operate for up to 50 hours annually in certain non-emergency situations, which operation counts toward the 100-hour annual limit. *See* 40 C.F.R. § 63.6640(f)(3), (4); 40 C.F.R. § 4211(f)(3), (4); 40 C.F.R. § 4243(d)(3), (4). On June, 30, 2015, EPA moved for voluntary remand without vacatur in light of the Court's May 1 decision in the instant cases. That motion, which APPA has supported, remains pending.

3

absent further action by EPA. *See* Mot. at 5 & n.2. Yet the only further action EPA commits to take on remand is to evaluate the need for, and possibly promulgate, regulations addressing emergency-engine operation during periods of voltage or frequency deviation. *See id.* at 13–15.

    4. APPA strongly supports a further rulemaking to promulgate regulations providing for the operation of emergency engines for this purpose—and delaying the issuance of the mandate until that rulemaking is completed. As EPA's motion demonstrates, the evidence in the rulemaking record shows that many small municipal utilities, especially in rural communities, rely on emergency engines operating under the current regulation to remedy voltage and frequency deviations. The EPA regulation incorporates industry standards for the quality of electric service and is intended to prevent local blackouts or brownouts and damage to the facilities and equipment of local distribution utilities and the public. *See* Mot., Exh. 1, at 3–6 (Comments of APPA, J.A. 1474–1476).

The Court's opinion does not question the need to operate emergency engines for this purpose, but only EPA's inadequate consideration of the alternative option of confining such operation to regions of the country without organized capacity markets. *See* Slip Op. at 26–28. Whether the current regulation should be modified is a question to be addressed by EPA on remand. There are many small municipal utilities and rural communities in regions without organized

capacity markets, and many in regions with such markets. Moreover, different organized capacity markets operate under different rules. In regions with capacity markets, the remanded issue involves more than drawing lines on a map.

Because of the need to protect the public from facility and equipment damage, brownouts, and blackouts due to voltage collapse and frequency deviations in electric service, the current regulation should remain in place until EPA issues an interim or final replacement rule. While EPA may be able to complete this task by May 1, 2016, such a short, arbitrary deadline is unreasonable given the vital public interest in reliable, quality electric service. *See, e.g.,* 16 U.S.C. §§ 824(a), 824*o*.

5. EPA's motion does not indicate what action, if any, the agency intends to take on the other remanded issues, concerning the regulations allowing emergency engines to operate for the second purpose—"for emergency demand response" during a "declared Energy Emergency Alert Level 2." But these regulations, too, should remain in place until EPA has acted on remand.

EPA acknowledges that vacating the emergency demand response regulation before August 31, 2015, would endanger the reliability of the electric grid. *See* Mot. at 6–9. To its credit, EPA heeds the counsel of PJM Interconnection, L.L.C., the entity operating the bulk electric transmission grid in a 13-state region, that vacating EPA's emergency demand response regulation in the summer of 2015

5

would disrupt PJM's plans and operations. *See id.* at 7. But EPA has only partially heeded PJM's warnings. The grid operator's June 2, 2015, letter to EPA counsel begins by emphasizing that PJM has relied on emergency engines to protect grid reliability during the winter, and that PJM hopes for clarifying interim regulations before the winter of 2016. (Declaration of Melanie King, Exhibit H, at 2.)

EPA's motion does not provide information on the views of either PJM or the General Counsel of the Federal Energy Regulatory Commission (FERC) on what EPA actually requests—a vacatur of the emergency demand response regulation on May 1, 2016, without any assurance of interim regulations or any EPA plans ever to revisit the issue. Thus, while EPA asserts that delaying the vacatur of its emergency demand response regulation until May 1, 2016, would "allow time for capacity resource markets to adjust to the potential loss of capacity resources represented by engines that choose not to install controls," Mot. at 11, EPA provides no evidence for this claim from FERC, PJM, or any other source.

Indeed, May 1, 2016, does not coincide with the actual plans and operations of regional capacity resource markets. PJM's capacity market, for example, operates with yearly commitments running from June 1 to May 31. (*See* King Dec., Exh. H, at 1.) Similarly, the Midcontinent Independent System Operator's plan year begins in June. (*See* King Dec., Exh. I, at 1.)

6

Until EPA has sorted out the facts and obtained the views of industry and FERC on the real matters at issue, the Court should withhold issuance of the mandate vacating the emergency demand response regulation.

WHEREFORE, EPA's motion for a stay of the issuance of the mandate should be granted, but the stay should continue until EPA acts on remand on both the regulations for voltage and frequency deviations and for emergency demand response.

Respectfully submitted,

 s/ Randolph Elliott
Delia D. Patterson
General Counsel
Randolph Elliott
Regulatory Counsel
American Public Power Association
2451 Crystal Drive, Suite 1000
Arlington, VA 22202
202-467-2900

Leslie Ritts
Ritts Law Group, PLLC
The Carriage House
620 Fort Williams Parkway
Alexandria, VA 22304
703-823-2292

*Counsel for American Public Power Association*

July 30, 2015

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of July 2015, I have caused the foregoing document to be served by first-class U.S. Mail on

Robert G. Dreher
U.S. Department of Justice
Environmental and Natural Resources Division
PO Box 23986, L'Enfant Plaza Station
Washington, DC 20026-3986

I further certify that on that on that same date, I have caused the foregoing document to be electronically served via the court's CM/ECF system on:

| | |
|---|---|
| Melissa E. Birchard | melissa.birchard@spiegelmcd.com |
| Shanna Michelle Cleveland | scleveland@clf.org |
| Lisa G. Dowden | lisa.dowden@spiegelmcd.com |
| Valerie Melissa Edge | valerie.edge@state.de.us |
| Aaron Michael Flynn | flynna@hunton.com |
| David M. Friedland | dfriedland@bdlaw.com |
| Michael J. Horowitz | horowitz.michael@epa.gov |
| Stephanie S. Lim | sslim@kslaw.com |
| Ashley Charles Parrish | aparrish@kslaw.com |
| Caitlin Sumner Peale Sloan | cpeale@clf.org |
| Matthew E. Price | mprice@jenner.com |
| Austin David Saylor | austin.saylor@usdoj.gov |

| | |
|---|---|
| Stephanie J. Talbert | stephanie.talbert@usdoj.gov |
| David G. Tewksbury | dtewksbury@kslaw.com |
| William L. Wehrum Jr. | wwehrum@hunton.com |

 s/ Randolph Elliott
American Public Power Association
2451 Crystal Drive, Suite 1000
Arlington, VA 22202
202-467-2952