ORAL ARGUMENT HEARD ON SEPTEMBER 26, 2014
AMENDED PANEL DECISION AND JUDGMENT
ISSUED ON JULY 21, 2015

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| DELAWARE DEPARTMENT OF <br> NATURAL RESOURCES <br> AND ENVIRONMENTAL <br> CONTROL, ET AL., <br>     Petitioners, <br><br> v. <br><br> ENVIRONMENTAL PROTECTION <br> AGENCY, <br>     Respondent. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | Case Nos. 13-1093, <br> 13-1102, 13-1104 <br> (consolidated) |

**RESPONDENT-INTERVENORS' RESPONSE
TO MOTION BY EPA FOR STAY OF THE MANDATE**

EnerNOC, Inc., EnergyConnect, Inc., Gas Processors Association, Innoventive Power, L.L.C., and National Rural Electric Cooperative Association (collectively, "Respondent-Intervenors") hereby respond to Respondent Environmental Protection Agency's ("EPA") Motion for Stay of Mandate, Document Number ("DN") 1562706 ("EPA Stay Motion"), in the above-captioned cases. EPA requested a stay until May 1, 2016 based on its reasoning that affected engines could take up to ten months to install controls, and because EPA is

considering promulgating a rule allowing operation of emergency engines to address voltage or frequency deviations.[1] Respondent-Intervenors support EPA's request that the Court stay the issuance of the mandate in these consolidated cases, but, for the reasons explained below, respectfully urge the Court to grant a stay for thirty-six months from the date of the Court's opinion, or until May 1, 2018, which is the time allowed by Section 112 of the Clean Air Act for existing sources to achieve compliance with new emission standards for hazardous air pollutants.

I. THE CLEAN AIR ACT ALLOWS THREE YEARS FOR EXISTING SOURCES TO COMPLY WITH NEW EMISSIONS STANDARDS FOR HAZARDOUS AIR POLLUTANTS

Section 112 of the Clean Air Act provides EPA with the authority to allow existing sources <u>three years</u> to achieve compliance with new emission standards for hazardous air pollutants. 42 U.S.C. § 7412(i)(3). And that is in effect the situation here: industry reasonably relied on a rule that allowed emergency engines to participate in the market as emergency demand response resources without being subject to hazardous air pollutant emission standards. Absent a stay of the mandate in these cases,[2] industry will be required, in effect, to comply with a new rule.

---

[1] EPA, however, also argued that at the very least a stay should be granted through August 31, 2015 to avoid power supply interruptions caused by hot weather this summer.

[2] As set forth in our stay motion, Joint Motion of Respondent-Intervenors to Stay the Issuance of the Mandate and Allow Existing Standards to Remain in Place

2

EPA itself acknowledges that under the Clean Air Act it could provide significantly more time for compliance than May 1, 2016. Specifically, EPA in its motion states: "[a] stay until May 1, 2016, would be less than one-third of the time that EPA *ordinarily allows* for operators of these types of existing sources to come into compliance with newly-promulgated regulations." EPA Stay Motion at 10 (emphasis added). The purpose of the three-year period here is to provide sufficient time for existing sources to come into compliance (i.e., to install controls) for continued participation, or (as explained below) to adjust investment-backed commitments that can no longer be delivered in forward capacity markets.

EPA, however, only requests a stay of the mandate until May 1, 2016 to "afford engine operators a reasonable amount of time to install controls." EPA Stay Motion at 9. But EPA also acknowledges that, while the time to install controls would vary widely, the Agency has determined that "in *many cases* [installation] could take up to a year or longer." *Id* (emphasis added). And, EPA further notes that for public entities such as a public utility, "budget approval processes and other regulatory issues significantly lengthen the time needed to install controls." *Id*.

---

Pending Further EPA Action, DN 1562653 [hereinafter "Respondent-Intervenors' Stay Motion"], we disagree with EPA's preliminary interpretation of the effect of the Court's opinion—i.e., that emergency engine operation for emergency demand response is prohibited if the mandate is issued.

3

EPA cites to EPA employee Melanie King's Declaration ("King Declaration") as support for its request to stay the mandate until May 1, 2016 to allow for the installation of controls. The King Declaration, however, demonstrates that EPA received information from the American Public Power Association ("APPA") and NiSource indicating that installation of controls could take up to <u>eighteen months</u>. *See* King Declaration at ¶14, 17. Indeed, NiSource noted that the total time required for installing controls has "typically been 9-15 months, and can exceed 18 months" when issues outside of the original project scope arise. *Id.* at ¶17. EPA itself noted that "[t]he information EPA has received suggests that the time it could take to install controls that would be necessary to meet NSPS and NESHAP requirements for some types of non-emergency engines will vary widely depending on the particular circumstances, and could range from 4 weeks (for a simple installation) to 18 months (e.g., for a complex installation or for installation on a publicly owned engine where a budgeting and competitive bidding process may be required before installation can begin)." King Declaration at ¶11.

In its motion, EPA gave no indication that it found these upper-end projections to lack credibility; nor did EPA explain why it chose to disregard statements by APPA and NiSource indicating that more than ten months would be necessary to install controls for some engines. Indeed, widespread efforts to install

such controls could lead to longer delay if suppliers and qualified contractors are overwhelmed by a surge in installations. Accordingly, EPA's request of a stay of the mandate only until May 1, 2016 is arbitrary when considered against the information presented in the Agency's declaration.

    Two additional reasons also merit that the stay be extended beyond the time that EPA requested. First, in this instance, a stay of the mandate for thirty-six months is warranted where demand response resources have reasonably relied on the 2013 NESHAP rule to enter into long-term contracts with various market system operators. Because the markets at issue are forward capacity markets, participating demand response resources have entered into obligations to provide demand reductions in future delivery years, and, in the case of PJM, through May 31, 2018. A stay of thirty-six months is therefore not only consistent with the requirements of the Clean Air Act, but also fair in enabling affected engines to either fulfill delivery commitments under current rules or allow time for these engines to adjust their investment-backed commitments that can no longer be delivered.[3] Second, a stay of this duration will further allow EPA to engage in an

---

[3] While it is true that these engines could "trade out of" their obligations, a short stay would have the impact of creating a supply shortfall and a high cost for trading out of the obligation, resulting in financial harm to the owners and aggregators of these engines. This unnecessarily increases reliability risks to the system that might result from those willing to take the penalty of not performing rather than assume the financial loss of trading.

5

orderly rulemaking process to address the Court's concerns about the emergency demand response portions of the current rule.

For all of these reasons, Respondent-Intervenors respectfully request that the Court stay the issuance of the mandate for thirty-six months. At a minimum, however, the Court should stay the mandate for *at least* eighteen months, given that EPA received data from APPA and NiSource indicating that installing controls will require at least this much time in a number of instances.

## II. RELIABILITY CONCERNS ALONE MERIT STAYING THE MANDATE THROUGH MAY 2016

To address reliability concerns, EPA requested that a stay must run through at least August 31, 2015 to avoid disruptions to the electric grid caused by hot weather (EPA ultimately, however, requested a stay until May 1, 2016 to allow time for affected engines to install controls and to consider promulgating a new rule). While Respondent-Intervenors believe that a stay of thirty-six months is warranted, we agree with EPA that at a very minimum the stay should avoid short-term market disruption.

However, as explained further below, EPA's rationale for why a stay must run through only August 31, 2015 for purposes of reliability ignores three key market realities. First, to avoid short-term market disruption, a stay must extend through the current delivery year to May 31, 2016, the time period for existing delivery-year commitments. Second, a stay must also enable emergency demand

6

response resources to continue to respond to severe weather in the winter season, as has been necessary in recent years to maintain grid operation. And, third, maintaining the power supply even in the hot weather season alone requires extending a stay at least through September 30, 2015, given that emergency demand response has historically been called beyond August.

### A. To Avoid Market Disruptions, a Stay Should Extend Through the Winter Season and to the End of the 2015-2016 Delivery Year to May 31, 2016

In its motion, EPA requested a minimum stay of through at least August 31, 2015 on the grounds that issuance of the mandate in the midst of the summer months could threaten electric grid reliability. EPA Stay Motion at 9; *see also id.* at 8 (quoting PJM Interconnection, Inc. ("PJM") as stating that issuance of the mandate this summer would be disruptive to grid reliability). Respondent-Intervenors, however, submit that for purposes of ensuring reliability during the current delivery year (which runs from June 1, 2015 through May 31, 2016), a stay should extend to May 31, 2016.

The time frame for the current delivery year for demand response contracts in PJM runs through May 31, 2016. The 2015/2016 Planning Year for PJM, meaning the time period demand response resources have committed to be available, began June 1, 2015 and ends May 31, 2016. *See* Letter from Craig Glazer, Vice-President-Federal Government Policy, PJM, to Austin Saylor, U.S.

7

Department of Justice (June 2, 2015), at 1. Delivery year obligations for Independent System Operator New England ("ISO-NE") also run from June 1 through May 31st of a given delivery year. *See ISO New England Inc. Transmission, Markets, and Services Tariff*, Section I, General Terms and Conditions, Subsection I.2.2, available at: http://www.iso-ne.com/participate/rules-procedures/tariff (defining "Capacity Commitment Period," the term used by ISO-NE to mean the delivery year, as "the one-year period from June 1 through May 31 for which obligations are assumed and payments are made in the Forward Capacity Market"). The ability to secure alternative resources during the delivery year equal to the quantity of demand response from these engines is unlikely and presents unnecessary system risk. Accordingly, to protect contractual obligations and grid reliability, Respondent-Intervenors respectfully request that the stay extend until at least May 31, 2016.

Moreover, a stay is necessary to enable emergency demand response resources to be available through the 2015-2016 winter season to avoid interruptions to the power supply caused by storms and extreme cold. As detailed in the DiCristofaro Affidavit filed with Respondent-Intervenors' stay motion, there has been a shift in the use of emergency demand response from predominantly summer to non-summer periods:

> In the early years of emergency demand response, it was primarily used during summer heat waves, when high use of air-conditioning

8

> places heightened demand on the power [sic] grid. However, over the history of emergency demand response, the data show a shift in predominance from summer to non-summer events. From 2007 through 2015 to date, there has been more emergency demand response in the non-summer period (when typically caused by storms and cold weather) than in summer. Specifically, since the beginning of 2007 there has been a nationwide average of 12.4 hours of cumulative non-summer use (approximately 1.4 hours per year), as compared to a nationwide average of 11 hours of cumulative summer use (approximately 1.3 hours per year).

DiCristofaro Affidavit at ¶6. Extreme and prolonged cold weather periods can interrupt the delivery of natural gas to power plants, as occurred most recently during the winter of 2014. *See, e.g.*, *id.* at ¶12 (describing the need for emergency demand response in Electric Reliability Council of Texas ("ERCOT") in response to the severe cold weather conditions in January of 2014, referred to as the "Polar Vortex") and ¶¶14, 17 (describing similar conditions in PJM). When severe cold weather events occur, the use of emergency engines to provide emergency demand response can become necessary to avoid power losses—a vital function for keeping people safe during extreme cold spells.

As there have been more emergency demand response events in the winter than in summer for the past eight years, Respondent-Intervenors request that, for purposes of maintaining grid reliability and avoiding market disruptions in the current delivery year, a stay should extend through the winter season, and at least through May 31, 2016.

9

### B. The Summer Season Extends at Least through September 30, 2015

Finally, if the Court declines to grant a stay beyond the current summer season—though, for the reasons explained herein, Respondent Intervenors urge the Court to grant a stay for the duration needed to address the issues set forth above—the Court should at the very minimum stay the mandate through September 30, 2015 in order to avoid power supply interruptions caused by summer hot weather events.

The hot weather that requires all resources to be available to maintain grid stability is likely to continue beyond the end of August. These grid resources include the approximately 1,500 megawatts of demand response resource currently committed to PJM, *see* EPA Stay Motion at 7, that would be lost if the Court issued the mandate this summer. Historically, PJM has utilized emergency demand response into September. Indeed, the largest dispatch of emergency demand response in PJM's history occurred on September 11, 2013, where emergency demand response was needed in 15 zones in PJM for periods ranging from 3.25 to 6 hours. Emergency demand response was also required the day before, on September 10, 2013, in two zones ranging from 4.75 to 5.7 hours. Prior to 2013, PJM utilized emergency demand response twice in late September (September 23, 2010 and September 24, 2010) for periods ranging from 5.5 to 6 hours in various zones. PJM, Summary of PJM-Initiated Load Management

10

Events, Operations Information, https://www.pjm.com/~/media/planning/res-adeq/load-forecast/alm-history.ashx.

The fact that PJM has historically needed to utilize emergency demand response into the month of September is reflected in PJM's definition of the demand response products upon which it relies.  Demand response products refer to the commitment customers make when bidding demand reductions into the market.  PJM utilizes three relevant market products: 1) Limited Demand Response; 2) Extended Summer Demand Response; and 3) Annual Demand Response.  Affected engines participate in the demand response market by bidding commitments into these various product tranches.

PJM's Limited Demand Response product requires customers to commit to reducing their electricity usage at the direction of PJM during emergency conditions up to a maximum of ten times during the summer months.  For this product, PJM requires demand response resources to be "available…during the summer period of June through September in the Delivery Year."  PJM Manual 18, Section 4.3.1., Requirements of Load Management Products in RPM, 52, available at https://www.pjm.com/~/media/documents/manuals/m18.ashx.  PJM's Extended Summer Demand Response product works similarly to the Limited Demand Response product, but the number of interruptions at PJM's direction can be unlimited for six months.  To participate in PJM's Extended Summer Demand

11

Response product, demand response resources must be "available…during an extended summer period of June through October, and the following May." *Id.* Finally, with PJM's Annual Demand Response product, PJM may call an unlimited number of interruptions during a delivery year, which runs from June through the following May.

In sum, for emergency engines to participate in any of these three emergency demand response products, demand response resources must commit to being available from June through September at a minimum.[4]  This requirement presumably reflects PJM's assessment that it must have available any participating demand response resources through *at least* the end of September to avoid significant disruption to grid stability caused by hot weather.

From a practical standpoint, then, a stay granted to ensure that issuance of the mandate does not threaten electric grid reliability during the current summer must at a minimum extend through September 30, 2015.

## CONCLUSION

For all of the reasons discussed above, Respondent-Intervenors respectfully request that the Court stay the issuance of the mandate for thirty-six months.

---

[4] Other system operators have even more extended requirements for the summer capability period.  The New York Independent System Operator, for example, requires demand response resources to commit to being available from May 1 through October 31st in a delivery year.  *See* NYISO, Markets & Operations, Frequently Asked Questions, http://www.nyiso.com/public/markets_operations-services-customer_support-faq-index.jsp (last visited July 21, 2015).

                                        Respectfully submitted,

DATED: July 30, 2015



*/s/ David M. Friedland*

David M. Friedland
Beveridge & Diamond, P.C.
1350 I Street NW, Suite 700
Washington, DC 20005
Phone: (202) 789-6000

*Counsel for EnerNOC, Inc.,
EnergyConnect, Inc., and Innoventive
Power, LLC*


William Wehrum
Hunton & Williams LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
Phone: (202) 955-1500

*Counsel for Gas Processors Association
and National Rural Electric
Cooperative Association*

13

# **CERTIFICATE OF SERVICE**

I hereby certify that this Respondent-Intervenors' Response to Motion by EPA For Stay of the Mandate was served electronically through the Court's CM/ECF system on all registered counsel.

Date:  July 30, 2015                    */s/ David M. Friedland*
                                        David M. Friedland
                                        Beveridge & Diamond, P.C.
                                        1350 I Street NW, Suite 700
                                        Washington, DC 20005
                                        (202) 789-6000

                                        *Counsel for EnerNOC, Inc.,*
                                        *EnergyConnect, Inc., and Innoventive*
                                        *Power, LLC*