ORAL ARGUMENT HEARD ON SEPTEMBER 26, 2014
AMENDED PANEL DECISION AND JUDGMENT
ISSUED ON JULY 21, 2015

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| DELAWARE DEPARTMENT OF NATURAL RESOURCES AND ENVIRONMENTAL CONTROL, ET AL., | ) ) ) ) | |
| Petitioners, | ) ) ) | Case Nos. 13-1093, 13-1102, 13-1104 (consolidated) |
| v. | ) ) | |
| ENVIRONMENTAL PROTECTION AGENCY, | ) ) | |
| Respondent. | ) | |

REPLY OF RESPONDENT-INTERVENORS
TO RESPONSE BY INDUSTRY PETITIONERS, PETITIONER
CONSERVATION LAW FOUNDATION, AND PETITIONER-
INTERVENOR ELECTRIC POWER SUPPLY ASSOCIATION
<u>TO MOTIONS TO STAY THE MANDATE</u>

EnerNOC, Inc., EnergyConnect, Inc., Gas Processors Association,

Innoventive Power, L.L.C., and National Rural Electric Cooperative Association

(collectively, "Respondent-Intervenors") hereby reply to the Joint Opposition of

the Industry Petitioners,[1] Petitioner Conservation Law Foundation, and Petitioner-

---

[1] Calpine Corporation, PSEG Power L.L.C., and FirstEnergy Solutions.

Intervenor Electric Power Supply Association[2] to Respondent's and Respondent-Intervenors' Motions to Stay the Issuance of the Mandate, Document Number ("DN") 1565045 ("Joint Opposition"), in the above-captioned cases.

For the reasons discussed below, Petitioners' arguments are unpersuasive and Respondent-Intervenors therefore respectfully request that the Court grant a stay for thirty-six months from the date of the Court's opinion.  Among the other reasons set forth in our previous filings, a stay of this duration will allow EPA to engage in an orderly rulemaking process to address the Court's concerns about the emergency demand response portions of the current rule.

## I.     BLACKOUTS THAT ARE OTHERWISE PREVENTABLE BY UTILIZING EMERGENCY DEMAND RESPONSE WOULD RESULT IN WORSE ENVIRONMENTAL AND PUBLIC HEALTH HARMS

Petitioners argue that staying the mandate would cause environmental harm resulting from the continued operation of diesel engines without pollution controls. Joint Opposition at 8.  This argument, however, ignores the fact that emergency demand response resources are used by grid operators to avoid grid disruptions that can ultimately lead to, and have previously led to, blackouts, which cause far worse environmental and public health outcomes.  Therefore—and contrary to Petitioners' assertions—the harm that emergency demand response resources help

---

[2] Collectively, "Petitioners."

to prevent is "actual and not theoretical."  *See Wisconsin Gas Co. v. FERC*, 758

F.2d 669, 674 (D.C. Cir. 1985).[3]

Petitioners, in short, ignore the forest for the trees.  When compared to the

adverse environmental and public health effects caused by a blackout, the

emissions from emergency engines are significantly less harmful.  As discussed

further below, emergency engines are dispatched locally and run for limited

periods of time when needed.[4]  The emissions that result from this very limited

and preventative use are, in contrast, dwarfed by the amount of emissions that

would be generated in the event of a blackout, where *all* available uncontrolled

emergency generators from residential as well as businesses are operating.  Indeed,

the environmental benefit of using emergency demand response was the reason

EPA and many states have allowed emergency engines to participate in emergency

demand response programs without controls.  EPA explained this comparative

savings in generated emissions in its Response to Comments for the 2013

NESHAP rule, stating that:

---

[3] All parties agree that the environmental and public health consequences of a blackout are severe and therefore desirable to prevent.

[4] As detailed in the DiCristofaro Affidavit filed with Respondent-Intervenors' stay motion, Joint Motion of Respondent-Intervenors to Stay the Issuance of the Mandate and Allow Existing Standards to Remain in Place Pending Further EPA Action, DN 1562653, the overall annual average dispatch time for all demand response programs for which data is available is approximately four hours per year. Affidavit of Don DiCristofaro at ¶¶ 7, 24, 27.

> [T]here are substantial environmental consequences of actual blackouts, when all emergency generators, *including the vast majority that would not have been called under EEA Level 2*, will operate. Operation of some emergency engines to prevent such blackouts is preferable environmentally and will also prevent many of the other problems that people endure during blackouts.

EPA, Response to Public Comments on Proposed Amendments to National Emission Standards for Hazardous Air Pollutants for Existing Stationary Reciprocating Internal Combustion Engines and New Source Performance Standards for Stationary Internal Combustion Engines, EPA Docket EPA-HQ-OAR-20008-0708 (Jan. 14, 2013), at 48 ("EPA Response to Comments") (JA2580).

Blackout conditions also cause adverse environmental effects beyond air emissions, such as the release of sewage into bodies of water, as well as heat-related and other health problems or deaths. As EPA notes, the National Institutes of Health ("NIH") published a study describing the health consequences of the 2003 blackout in New York City:

> We found that mortality and respiratory hospital admissions in NYC increased significantly (two- to eightfold) during the blackout […]. The most striking increases occurred among elderly, female, and chronic bronchitis admissions. We identified stronger effects during the blackout than on comparable hot days. This study suggests that power outages may have important health impacts, even stronger than the effects of heat alone.

EPA Response to Comments at 82-83 (JA2614). The New Hampshire Department of Environmental Services ("NHDES") cited a similar rationale in permitting

4

emergency engines, including those participating in the Independent System Operator New England's emergency demand response program, to operate for up to 500 hours per 12-month consecutive period, stating that "NHDES […] believes that the air quality impacts from operating emergency engines to prevent a power outage are outweighed by the public health impacts created if a power outage were to occur."  NHDES Comments – Proposed Amendments to RICE NESHAP and NSPS (77 FR 33812-33857), EPA Docket EPA-HQ-OAR-20008-0708 (Aug. 9, 2012), at 2 (JA2558-2559).  In sum, the environmental and public health effects of a blackout are not conjecture: they are, as the NIH study shows, quite serious. Accordingly, these consequences must be appropriately weighed against the limited effects of operating emergency engines—the whole purpose of which is to prevent such an outcome—during the requested stay.

## II.    A STAY IS NECESSARY TO ENSURE RELIABILITY THROUGH THE SUMMER SEASON

Petitioners' main argument concerning reliability is that because "PJM has procured more than 8,000 MW in excess of its target reliability requirement," losing approximately 1,500 megawatts ("MW") of capacity from affected emergency engines participating in PJM's emergency demand response program would be inconsequential if the mandate were to issue this summer.  Joint Opposition at 11.  This argument is not persuasive for several reasons.  First, the 8,000 MW Petitioners reference is not, in fact, excess capacity.  PJM did procure

8,000 MW of capacity in excess of its reliability target, which was a result of a new load-forecasting methodology that lowered overall demand projections in near-term years. However, PJM and FERC subsequently determined that this 8,000 MW of capacity was in fact needed to deal with contingencies that threatened PJM's ability to maintain reliability.

Second, Petitioners' argument does not take into account the fact that there is a localized component to reliability issues. The 8,000 MW of capacity is system-wide across PJM, an area that encompasses fourteen states, and therefore does not necessarily reflect the capacity actually available in any given sub-region. Emergency demand response, however, is dispatched locally (by zone, or in some cases, even by sub-zone) to help to avoid grid reliability problems where capacity elsewhere in the system may not be available or able to be delivered to the area where there is a need.

Indeed, as PJM stated in its 2012/2013 Demand Response report, "PJM calls Emergency DR (Load Management) events by zone (or sub-zone and lead time). This allows PJM to address system conditions in a targeted, measured and phased manner." PJM, Emergency Demand Response (Load Management) Performance Report 2012/2013, at 15 (Dec. 2012) ("PJM 2012/2013 Performance Report"), *available at* http://www.pjm.com/~/media/markets-ops/dsr/emergency-dr-load-management-performance-report-2012-2013.ashx. For example, PJM dispatched

emergency demand response resources locally by zone or subzone in 2012 (in the AEP and Dominion zones on July 17), *id.* at 5, Figure 2; 2013 (in the ATSI zone on July 15), PJM, Emergency Demand Response (Load Management) Performance Report 2013/2014, Version 2, at 6, Figure 2 (April 2014), *available at* http://www.pjm.com/~/media/markets-ops/dsr/2013-2014-dsr-activity-report-20140417.ashx; and 2014 (in the BGE and PEPCO zones on January 22), PJM 2012/2013 Performance Report at 5, Figure 2. This ability to call emergency demand response resources can be critical to avoiding localized disruptions and preventing their spread regionally—in a worst-case scenario, causing a major blackout like that experienced by the northeast in 2003.

Petitioners' reliability argument also ignores the fact that PJM is only one market. Were the Court's mandate to issue this summer, numerous emergency demand response programs in a number of markets would be affected. Thus, the fact that PJM has obtained 8,000 MW of additional capacity does not negate the need for emergency demand response resources elsewhere—nor, potentially, even in PJM itself, as we explain above. Accordingly, Petitioners' arguments that are based solely on PJM's activities miss the mark in that they ignore the remainder of the markets.

Petitioners' other arguments regarding EPA's justification for a stay based on reliability concerns similarly fall flat. First, Petitioners contend that EPA's

7

position that a stay is needed through the summer season[5] to ensure electric grid

reliability is "unsupported." Joint Opposition at 10. Specifically, Petitioners argue

that PJM "merely suggested" it could face "particular operational challenges" if the

Court's mandate issued this summer. *Id.* In fact, in PJM's June 2, 2015 letter to

DOJ addressing "certain key facts associated with the impact of the Court of

Appeal's ruling […] *on reliability* of the bulk power electric grid," (emphasis

added), PJM stated:

> As a system operator, we have a long-standing practice of attempting
> to avoid significant disruptions or new operating rules during the
> summer months as this is a period when *all resources are needed*
> should we see multiple days of hot weather in our footprint as we
> have seen in past years.

Letter from Craig Glazer, Vice-President-Federal Government Policy, PJM, to

Austin Saylor, U.S. Department of Justice (June 2, 2015), at 1, 2 (emphasis added).

This statement goes beyond a mere suggestion that PJM could face operational

challenges: it clearly states that all resources will be needed to maintain grid

reliability if there is again a hot spell during this summer season.

Petitioners next argue that while EPA "claims" that FERC supports a stay,

"FERC itself has provided no justification at all for that support." *Id.* at 11. We

find it surprising that Petitioners, who have argued for the need to defer to FERC's

---

[5] As explained in our response to EPA's stay motion, the "summer season" must
extend through at least September 30, 2015 to avoid power supply interruptions
caused by hot weather events. *See* Respondent-Intervenors' Response to Motion
by EPA for Stay of the Mandate, DN 1565531, at 10-12.

authority throughout this proceeding, would question FERC's determination at this juncture. As EPA represented in its motion for a stay, FERC's Office of General Counsel advised EPA that it supports a stay through August 31, 2015. Respondent Environmental Protection Agency's Motion for Stay of Mandate, DN 1562706, at 7 ("EPA Stay Motion"). Unless Petitioners are questioning the veracity of that representation, FERC clearly stated its position.

### III.  PETITIONERS MISCHARACTERIZE EPA'S RATIONALE FOR A STAY THROUGH MAY 1, 2016

Petitioners fundamentally mischaracterize EPA's request for a stay to May 1, 2016 to allow affected engines to install controls. Petitioners claim that EPA makes that request "because such engines may be needed for local grid reliability." Joint Opposition at 12. That is not what EPA requested. EPA stated, "[i]n light of the Court's May 1, 2015 decision, operators of engines that are used for purposes of emergency demand response will need to determine whether to install the controls required of non-emergency engines so as to be able to continue such operation." EPA Stay Motion at 9-10. So, it is clear that EPA wants to allow operators of engines a period of time to respond to the Court's opinion so that they are not forced to operate in noncompliance or shut down immediately. This rationale is largely independent of EPA's arguments about grid reliability.

Because EPA does not make the claims Petitioners allege, the Court should ignore Petitioners' arguments on this point.[6]

## CONCLUSION

For all of the reasons discussed above, Respondent-Intervenors respectfully request that the Court stay the issuance of the mandate for thirty-six months.

Respectfully submitted,

---

[6] Petitioners also argue that both EPA and Respondent-Intervenors rely only on the voltage or frequency deviation provision to support the request for the longer stay of the emergency demand response provisions. Joint Opposition at 13. This is clearly not accurate. Respondent-Intervenors' *entire* motion for a stay is concerned with the need to stay the mandate with respect to operation during North American Electric Reliability Corporation (NERC) Energy Emergency Alert Level 2 events. And EPA's argument regarding the installation of pollution controls applies to both the Energy Emergency Alert Level 2 provision and the voltage or frequency deviation provision. *See* EPA Stay Motion at 9-11.

DATED: August 7, 2015

*/s/ David M. Friedland*

David M. Friedland
Beveridge & Diamond, P.C.
1350 I Street NW, Suite 700
Washington, DC 20005
Phone: (202) 789-6000

*Counsel for EnerNOC, Inc.,*
*EnergyConnect, Inc., and Innoventive*
*Power, LLC*

William Wehrum
Hunton & Williams LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
Phone: (202) 955-1500

*Counsel for Gas Processors Association*
*and National Rural Electric*
*Cooperative Association*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this Reply of Respondent-Intervenors to Response by Industry Petitioners, Petitioner Conservation Law Foundation, and Petitioner-Intervenor Electric Power Supply Association to Motions to Stay the Mandate was served electronically through the Court's CM/ECF system on all registered counsel.

Date:  August 7, 2015                    */s/ David M. Friedland*
                                          David M. Friedland
                                          Beveridge & Diamond, P.C.
                                          1350 I Street NW, Suite 700
                                          Washington, DC 20005
                                          (202) 789-6000

                                          *Counsel for EnerNOC, Inc.,*
                                          *EnergyConnect, Inc., and Innoventive*
                                          *Power, LLC*